UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

Joseph Miller and Alexander Graham,

                         Plaintiffs,

v.

Matthew Bostrom, Ramsey County Sheriff,
in his official and individual capacities, and
County of Ramsey, a municipal corporation,

                         Defendants.

Civ. No. 11-2401 (RHK/TNL)
**MEMORANDUM OPINION AND ORDER**

---

Mark W. Gehan, Sarah J. McEllistrem, Mark H. Gehan, Collins, Buckley, Sauntry & Haugh, P.L.L.P., Saint Paul, Minnesota, for Plaintiffs.

Charles N. Nauen, William A. Gengler, Brian D. Clark, Lockridge Grindal Nauen P.L.L.P., Minneapolis, Minnesota, for Defendants.

---

### INTRODUCTION

In the 2010 Ramsey County Sheriff's election, Plaintiffs Alexander Graham and Joseph Miller, both employees of the Sheriff's Office, campaigned for the incumbent Sheriff, Bob Fletcher. Fletcher lost the election to Defendant Matthew Bostrom. Before Fletcher left office, however, he hired both Plaintiffs as deputy sheriffs.[1] Within weeks of Bostrom taking office both Plaintiffs were terminated without explanation. They commenced this action against Bostrom and Ramsey County alleging they were fired in retaliation for supporting Fletcher in the election, in violation of their First Amendment

---

[1] After the election, Fletcher had advised Bostrom that he intended to hire three or more deputies during his remaining tenure but would leave five vacancies for Bostrom to fill.

rights. Defendants now move for summary judgment; for the reasons that follow, the Court will grant the Motion in part and deny it in part.

## BACKGROUND

In 2010, incumbent Bob Fletcher and new-comer Matthew Bostrom participated in a heated election for Ramsey County Sheriff. Plaintiffs, who were employed by the Sheriff's Office at the time, campaigned for Fletcher. They participated in parades, went door-to-door, and put up yard signs for him.

Both Plaintiffs allege Bostrom knew they were campaigning against him. Graham alleges Bostrom saw him towing a Fletcher float during a local parade. He believes Bostrom recognized him because the two had met for an interview the year before, but Bostrom does not recall seeing Graham at the parade. Graham also alleges that Bostrom's wife and another Bostrom supporter photographed his truck and license plate during the parade. (Graham Dep. 25.) Miller alleges that Bostrom knew he was campaigning for Fletcher because of a complaint lodged against Miller by the Bostrom campaign. The complaint alleged that an unknown person had been removing Bostrom signs and replacing them with Fletcher signs. (Pls.' Mem. Ex. 6.) The complaint did not name Miller, but the Bostrom campaign identified him as the alleged perpetrator using his license plate number, and sending an email to Bostrom and a reporter explaining the incident and describing Miller's employment with the Ramsey County Sheriff's Office. (Id. Exs. 7, 8.) The Saint Paul *Pioneer Press* and other news organizations ran stories on the incident, although none named Miller. (Id. Exs. 4, 5.) Afterward, Miller received Facebook messages from "Darrt Pac," a group supporting Bostrom, requesting he return

the signs he "stole." (Id. Ex. 10.) Bostrom acknowledges that he was aware of the sign-stealing incident, but denies knowing that Miller was involved. (Bostrom Dep. 10–11.)

Despite Plaintiffs' efforts, Fletcher lost the election. Afterward, and while remaining in office, Fletcher hired several new deputy sheriffs including Graham and Miller, who were sworn in on December 27, 2010, and January 1, 2011, respectively. As was standard practice in the Sheriff's Office, Plaintiffs began a one-year "probationary" period of employment, during which they could be terminated for any lawful reason. On January 3, 2011, Bostrom took office as the new Sheriff and, several weeks later, each Plaintiff received notice in the mail that he had been terminated. The letters stated that each Plaintiff had "not met the expectations of a Ramsey County Sheriff's Deputy" and "would not pass [the] probationary period." (Pls.' Mem. Ex. 25.) No further explanation was provided. Plaintiffs then commenced this action alleging that Bostrom knew they had campaigned against him in the election and terminated them in retaliation for it.

In response, Defendants assert that Plaintiffs were terminated due to facts uncovered during their background investigations, not for their political activities. According to Defendants, Plaintiffs' (and approximately ten other newly hired deputies') background investigations had not yet been completed when Bostrom took office.[2] (Kirkwood Dep. 14; Camitsch Dep. 31.) Commander Brad Camitsch brought this matter to the attention of Bostrom's Chief Deputy, John Kirkwood, just a few days after Bostrom was sworn in and Kirkwood ordered him to complete them. (Camitsch Dep.

---

[2] Plaintiffs allege that their background investigations had already been completed before Bostrom took office. (Fletcher Dep. 74.)

32.) Camitsch chose to begin the investigations with Graham and Miller because he thought their backgrounds "had the most serious issues," and their files were the first to be assigned to the investigator, Sergeant Erik Lerfald. (Id. at 26, 33.) Within ten days, Lerfald had completed their investigations and sent the summaries to Kirkwood.

Kirkwood testified that he decided to terminate Plaintiffs after reviewing their backgrounds because of the "derogatory" information they revealed. (Kirkwood Dep. 9.) Specifically, Graham had "failed" three previous background checks for other law-enforcement positions, was investigated for failure to adhere to orders as a community service officer for the City of Roseville, incorrectly counted the razors he distributed to inmates and received poor reviews from his supervisors as a temporary correctional officer for Ramsey County, and had a few cautionary notes in psychological examination. Miller had been arrested and/or cited for misdemeanors four times (including two juvenile arrests), "failed" the psychological examination for Ramsey County twice before, and had cautionary notes in his latest psychological examination.

Kirkwood also testified that he alone made the decision to fire Plaintiffs and Bostrom was not involved. But he acknowledged that before terminating Plaintiffs, he checked with or "informed" Bostrom, who told him to first run it by the Ramsey County Attorney's Office and Human Resources. On February 7, 2011, Kirkwood sent letters terminating Plaintiffs—less than six weeks after they were sworn in. (Pls.' Mem. Ex. 25.) Notably, none of the other new deputies who supported Fletcher was terminated.

Plaintiffs assert that their background investigations were used as a pretext for retaliation and that they were intentionally singled out for additional investigation in

- 4 -

order to find an excuse to fire them.[3] Fletcher testified that all of the deputies he hired, including Plaintiffs, were interviewed, passed psychological and fitness examinations, and had complete background checks before he swore them in. (Fletcher Dep. 74.) Therefore, Plaintiffs believe that the "re-backgrounding" was unnecessary and pretextual. Fletcher stated that, in his thirty-five years in law enforcement, he had never heard of an officer being terminated in the first quarter of the probationary period without "cause," nor had he heard of a sheriff conducting another background investigation on a deputy who had already been hired. (Fletcher Aff. ¶¶ 9–10.) Camitsch also testified that, in his twenty-three years with law enforcement, the investigations done on Plaintiffs were "unique." (Camitsch Dep. 55.)

Plaintiffs assert that they were treated differently than the other employees who were also "re-investigated." There were nine other deputies on probation with (allegedly) incomplete background, some with "red flags" in their criminal histories and/or psychological examinations and some whose probationary periods were ending much sooner than Plaintiffs'. (See Pls.' Mem. Exs. 22–23.) Nevertheless, Plaintiffs were investigated first and most quickly. Plaintiffs' investigations were completed by January 20, 2011 (Camitsch Dep. 27), but others' investigations were not completed until April, (id. at 34–35; Pls.' Mem. Exs. 17, 18). Plaintiffs also allege that their background

---

[3] As evidence of pretext, Plaintiffs offer their own testimony that Bostrom said to Dave Metusalem, who works in the Sheriff's office, "If I don't like them I'll just get rid of them for something in their backgrounds." (Miller Dep. 111; Graham Dep. 132.) Defendants object to this statement because Metusalem denies it; out of caution, the Court will not consider it for the purpose of deciding the instant Motion. See Mays v. Rhodes, 255 F.3d 644, 648 (8th Cir. 2001) (a court generally may not consider hearsay evidence at summary judgment, unless it could potentially be offered in an admissible format at trial); see also Fed. R. Civ. P. 56; Fed. R. Evid. 802.

investigations were not as thorough as those of other probationary deputies. For example, the officer conducting their investigations did not contact their most recent supervisors, including Fletcher, who knew of their positive performances on the job. (Fletcher Aff. ¶ 14; Lerfald Dep. 25–26.) Also, other deputies were given the opportunity to sit down with their background investigator and explain the findings, but Plaintiffs were never afforded this opportunity. (Miller Dep. 56; Graham Dep. 68, 146.) Nor were they allowed to resign before being terminated, which had been the standard practice of the Sheriff's Office. (Fletcher Aff. ¶ 17.)

After his termination in 2011, Graham wrote to the Sheriff's Office requesting the "truthful reason" for it but never received a response. Plaintiffs then commenced this action against Bostrom and Ramsey County; both assert claims of First Amendment retaliation and Graham also asserts a claim under Minnesota Statutes § 181.933, which requires employers to give notice of the reason for terminating an employee. Defendants now move for summary judgment on all of Plaintiffs' claims. The Motion has been fully briefed, the Court heard oral argument, and it is ripe for disposition.

## STANDARD OF DECISION

Summary judgment is proper if, drawing all reasonable inferences in favor of the nonmoving party, there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986). The moving party bears the burden of showing that the material facts in the case are undisputed. Celotex, 477 U.S. at 322; Whisenhunt v. Sw. Bell Tel., 573 F.3d 565, 568 (8th Cir. 2009). The Court must view the evidence, and the

inferences that may be reasonably drawn from it, in the light most favorable to the nonmoving party. Weitz Co., LLC v. Lloyd's of London, 574 F.3d 885, 892 (8th Cir. 2009); Carraher v. Target Corp., 503 F.3d 714, 716 (8th Cir. 2007). The nonmoving party may not rest on mere allegations or denials, but must show through the presentation of admissible evidence that specific facts exist creating a genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); Wingate v. Gage Cnty. Sch. Dist., No. 34, 528 F.3d 1074, 1078–79 (8th Cir. 2008).

## ANALYSIS

I. **First Amendment Retaliation Claims Against Bostrom**

   A. **Plaintiffs' Prima Facie Case**

   To establish a prima facie case of retaliation, a plaintiff must show that (1) he engaged in an activity protected by the First Amendment, (2) he suffered an adverse employment action, and (3) the protected conduct was a "substantial or motivating factor" in the defendant's decision to take the adverse employment action. Morris v. City of Chillicothe, 512 F.3d 1013, 1018 (8th Cir. 2008). It is undisputed that Plaintiffs engaged in behavior protected by the First Amendment, and that they suffered adverse employment actions. Bostrom argues that Plaintiffs have not established their prima facie cases against him for two reasons.

   First, he did not terminate Plaintiffs but Chief Deputy Kirkwood did. Bostrom and Kirkwood each testified that Bostrom delegated his "authority and responsibility . . . to make operational decisions in accordance with staffing and budgeting" to Kirkwood, which included "all personnel matters." (Bostrom Dep. 23, 28.) Kirkwood testified that

he alone made the decision to fire Plaintiffs and merely informed Bostrom of his decision after it was made. But he "informed" Bostrom before executing his decision, and, in response, Bostrom instructed him to first check with Human Resources and the County Attorney's Office. Viewed in the light most favorable to Plaintiffs, this sequence of events suggests that Bostrom retained authority over the decision and that Kirkwood was merely acting at Bostrom's behest. In addition, Bostrom sent an email to Camitsch on January 25, 2011, inquiring as to another deputy's probationary status. (Pl.'s Mem. Ex. 24.) This too tends to suggest that Bostrom had more involvement in personnel matters than he acknowledges.

More fundamentally, however, the notion that the Ramsey County Sheriff had no involvement in choosing his own deputies strikes the Court as simply implausible. As Plaintiffs' counsel succinctly stated, "That's just not how the world works." (Hr'g Tr. 36.) This seems especially true given that Bostrom had 29 years of experience in the Saint Paul Police Department and Kirkwood had only four years of police experience. Drawing all reasonable inferences in favor of Plaintiffs, the Court concludes that a reasonable jury could determine that Bostrom was involved in Plaintiffs' termination.

Second, Bostrom asserts that Plaintiffs cannot show their political activity was a substantial or motivating factor in the decision to terminate them. The Court disagrees. Plaintiffs have offered evidence that they were singled out within a week of Bostrom taking office, and that, within six weeks, they were fired. An "adverse employment action that occurs on the heels of protected activity 'is significant evidence that what happened . . . was more than just coincidence.'" Davison v. City of Minneapolis, 490

F.3d 648, 657 (8th Cir. 2007) (quoting Hudson v. Norris, 227 F.3d 1047, 1051 (8th Cir. 2000)); but see Altonen v. City of Minneapolis, 487 F.3d 554, 561 (8th Cir. 2007) (insufficient evidence of retaliation where plaintiff "continued in her position as inspector for three months after [the police chief she campaigned against] was sworn in").

But Plaintiffs submit more than just a temporal connection in support of their claim. The record shows that Plaintiffs were never told how they had failed to meet the expectations of a deputy or why they would not have passed the probationary period. There was no allegation that Plaintiffs had misbehaved or that their performances were lacking. There was no incident alleged which would have called attention to them or called into question their qualifications for the job. And there is no evidence of budget cuts or a reduction in force prompting their terminations. Before receiving their termination letters in the mail, Plaintiffs had not been given any warning, any opportunity to sit down and explain their backgrounds, or any chance to resign. Fletcher testified that, in his thirty-five years of experience, he had never heard of a deputy being fired within the first quarter of probation without cause.

Plaintiffs may have been only "common worker bees" on Fletcher's campaign, as Defendants claim, but they have nonetheless proffered evidence that Bostrom knew who they were and that they had campaigned for his opponent in a heated election. See Shockency v. Ramsey County, 493 F.3d 941, 949 (8th Cir. 2007) (prima facie case of retaliation established where defendant sheriff saw plaintiff deputy at a parade supporting his opponent and she wore a campaign button on her purse). Accordingly, the Court

concludes that Plaintiffs have established a prima facie case of retaliation against Bostrom.

### B. Bostrom's Non-Retaliatory Reason

After a plaintiff establishes a prima facie case, the burden shifts to a defendant to submit a legitimate, non-retaliatory reason for the termination. Morris, 512 F.3d at 1019. Bostrom asserts that both Plaintiffs were fired because their background investigations demonstrated that they were not qualified to be deputy sheriffs. He offers testimony from himself, Kirkwood, and others confirming this was the reason for their termination and provides specific examples from each Plaintiff's background that cast doubt on their qualifications—such as Miller's criminal history or Graham's poor performance reviews. Therefore, Bostrom has made a sufficient showing that he had a legitimate reason to terminate Plaintiffs.

### C. Pretext

The burden then shifts back to Plaintiffs to demonstrate that Bostrom's proffered reason is merely a pretext. See id. [4] Plaintiffs assert that their background investigations had already been completed when they were hired, and thus Bostrom had no reason to investigate them to begin with. And even if their background checks were incomplete, there were nine other probationary deputies with incomplete background checks who were treated differently than them. See Marez v. St.-Gobain Containers, Inc., 688 F.3d

---

[4] The case law from the Eighth Circuit is unclear as to which analytical framework should apply to a First Amendment retaliation claim that does not present direct evidence, but all parties utilize the burden-shifting framework from McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), so the Court follows their lead.

958, 964 (8th Cir. 2012) (different treatment of similarly situated employees is evidence of pretext). For example, Plaintiffs were the first to be investigated even though other deputies' probationary periods were ending much sooner than theirs (and would therefore appear more urgent). Plaintiffs' investigations were completed in just ten days, while all of the other investigations were not completed for months. In addition, the other deputies who were investigated were afforded the opportunity to sit down with the investigators and explain their backgrounds and none of them was fired. Each of these discrepancies casts doubt on whether Bostrom's reason for terminating Plaintiffs was legitimate. Indeed, Plaintiffs offer testimony of two individuals who have worked in the Sheriff's Office that the additional investigation done on Plaintiffs was uncommon or unique. Finally, Plaintiffs submit evidence that other deputies *who were retained* by the Sheriff's Office also had criminal histories and/or negative psychological evaluations like the Plaintiffs. There is adequate evidence from which a reasonable jury could conclude that Plaintiffs' background investigations were merely a pretext for terminating them. Therefore, the Court will deny Bostrom's Motion for summary judgment on Plaintiffs' retaliation claims.

## II.     Monell **Claim Against Ramsey County**

Plaintiffs also assert a retaliation claim against Ramsey County and Bostrom in his official capacity.[5] In Monell v. Department of Social Services, 436 U.S. 658, 691 (1978),

---

[5] "[A]n official-capacity suit is, in all respects other than name, to be treated as a suit against the entity." Kentucky v. Graham, 473 U.S. 159, 166 (1985). Accordingly, the Court will treat the claim against Bostrom in his official capacity as one and the same as the claim against Ramsey County.

the Supreme Court held that a municipality may be liable under § 1983 for constitutional deprivations visited pursuant to official municipal policy or custom. "[A] municipality cannot be held liable solely because it employs a tortfeasor—or in other words, a municipality cannot be held liable under § 1983 on a respondeat superior theory." Id.

Plaintiffs allege that the County is liable because Bostrom acted according to the County's custom of "delegating the authority to make personnel decisions" to the Sheriff, which resulted in their termination. They argue, "Ramsey County . . . is liable for the consequences of administrative decisions, made on [its] behalf, by [its] officials to whom [it] delegated authority." The Supreme Court's holding in Pembaur v. City of Cincinnati, 475 U.S. 469, 481 (1986), made clear, however, that "[m]unicipal liability only attaches where the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered." Plaintiffs do not contend that Bostrom had the final authority to establish personnel *policy*, but merely that he had the authority to make personnel *decisions*. "The Supreme Court has distinguished final policy-making authority from final decisionmaking authority." Davison v. City of Minneapolis, 490 F.3d 648, 660 (8th Cir. 2007). Because there is no evidence that Bostrom had policy-making authority but was merely acting according to his discretion when he allegedly terminated Plaintiffs, his actions cannot give rise to municipal liability. See Pembaur, 475 U.S. at 483 n.12 ("[T]he County Sheriff may have the discretion to hire and fire employees without also being the county official responsible for establishing county employment policy. If this were the case, the Sheriff's decisions respecting employment would not give rise to municipal liability.").

### III. Graham's § 181.933 Claim

Minnesota Statutes § 181.933 states: "An employee who has been involuntarily terminated may, within 15 working days following such termination, request in writing that the employer inform the employee of the reason for the termination. Within ten working days following receipt of such request, an employer shall inform the terminated employee in writing of the truthful reason for the termination." Graham alleges that Bostrom violated this statute because Graham wrote a letter within fifteen days of his termination requesting the "truthful reason" for it and he never received a response. However, as Defendants note, employers may only be penalized for violating § 181.933 if the employee was terminated in violation of Minnesota's whistleblower statute, §181.932. See Minn. Stat. § 181.935 ("An employer who failed to notify . . . *an employee injured by a violation of section 181.932* is subject to a civil penalty . . . .") (emphasis added). Graham does not allege that he was terminated in violation of the whistleblower statute. Therefore, he cannot maintain a claim for Bostrom's alleged failure to notify him of the reason for his termination.

### CONCLUSION

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS ORDERED** that Defendants' Motion for Summary Judgment (Doc. No. 52) is **GRANTED IN PART** and **DENIED IN PART**. The Motion is **GRANTED** as to the retaliation claims against Ramsey County and Bostrom in his official capacity and as to

the § 181.933 claim against Defendants.  The Motion is **DENIED** as to the retaliation claims against Bostrom in his individual capacity.

Dated: February 7, 2013                                      s/Richard H. Kyle
                                                                                  RICHARD H. KYLE
                                                                                  United States District Judge